**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 13 2015, 10:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**NICOLE A. ZELIN**
Pritzke & Davis, LLP
Greenfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF C.C.K., MINOR CHILD, AND HIS MOTHER C.F., | ) ) ) ) | |
| | ) | |
| C.F., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 30A01-1405-JT-215 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE HANCOCK CIRCUIT COURT
The Honorable Richard D. Culver, Judge
The Honorable R. Scott Sirk, Commissioner
Cause No. 30C01-1311-JT-287

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

### CASE SUMMARY

Appellant-Respondent C.F. ("Mother") appeals the juvenile court's order terminating her parental rights to C.C.K. (the "Child"). On March 23, 2011, the Department of Child Services ("DCS") filed a petition alleging that the Child was a child in need of services ("CHINS"). The CHINS petition stated that DCS became involved with the family and the Child was removed from Mother's care after receiving allegations of poor living conditions and drug use by Mother. DCS subsequently became aware of concerns of domestic violence. On August 31 2011, the Child was adjudicated to be a CHINS following Mother's admissions to the allegations set forth in the CHINS petition.

DCS filed a petition seeking the termination of Mother's parental rights to the Child on November 13, 2013. Following a two-day evidentiary hearing, the juvenile court issued an order terminating Mother's parental rights to the Child. On appeal, Mother contends that DCS did not provide sufficient evidence to support the termination of her parental rights. We affirm.

### FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of the Child, who was born on August 19, 2007.[1] On March 21, 2011, law enforcement officers arrived at Mother's home after being called to perform a welfare check. Upon arriving at the home, officers found the door kicked in. DCS

Family Case Manager ("FCM") Bridgett Harter responded and found the home in disarray. FCM Harter observed that there was drug paraphernalia and a shotgun on the couch within the Child's reach, as well as spent shotgun shells. Mother also tested positive for cocaine and marijuana. Also on this date, DCS removed the Child from the home and initiated CHINS proceedings.

DCS filed a petition on March 23, 2011, alleging that the Child was a CHINS. In this petition, DCS alleged that Mother failed to provide the Child with a safe and appropriate living environment. On August 31, 2011, the juvenile court adjudicated the Child to be CHINS after Mother admitted to the allegations contained in the CHINS petition. The juvenile court issued a dispositional order and parental participation decree in which it ordered Mother to, among other things, (1) keep all appointments with DCS and service providers; (2) not remove the Child from the county for more than 72 hours without FCM Harter's consent; (3) maintain suitable, safe, and stable housing and a stable source of income; (4) not use or consume illegal drugs; (5) complete parenting and substance abuse assessments and the resulting recommendations. Mother failed to successfully comply with the parental participation decree.

On November 13, 2013, DCS filed a petition seeking the termination of Mother's parental rights to the Child. On March 19, and April 10, 2014, the juvenile court conducted an evidentiary termination hearing at which Mother appeared and was represented by counsel. During the termination hearing, DCS introduced evidence relating to continued concerns regarding Mother's inability or refusal to properly care for the Child and her failure

---

[1] The termination of the Child's Father's parental rights is not at issue in this appeal.

3

to participate in or benefit from the services offered by DCS. Specifically, DCS presented evidence demonstrating Mother's ongoing drug use, Mother's failure to obtain and maintain stable housing and employment, a history of domestic abuse between Mother and Father, and that Mother had failed to successfully complete the services ordered by the juvenile court. DCS also introduced evidence indicating that the termination of Mother's parental rights was in the Child's best interest and that its plan for the permanent care and treatment of the Child was adoption. Mother, for her part, presented evidence which she claimed demonstrated that she was beginning to make progress and, as such, should be given more time before her parental rights were terminated. Following the conclusion of the termination hearing, the juvenile court issued an order terminating Mother's parental rights to the Child. Mother now appeals.

## DISCUSSION AND DECISION

### I. Sufficiency of the Evidence

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child

4

relationship. *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or

the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
>> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
>> (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
>> (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) termination is in the best interests of the child; and
> (D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011). Mother does not dispute that DCS presented sufficient evidence to support the first and fourth elements set forth in Indiana Code section 31-35-2-4(b). Mother, however, does claim that DCS failed to establish the second and third elements that are required to be proven before a court can order the involuntary termination of a parent's parental rights. Specifically, Mother argues that DCS failed to establish either that (1) there is a reasonable probability that the conditions that resulted in the Child's removal

6

from or the reasons for the Child's continued placement outside of her home will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being the child. Mother also argues that DCS failed to establish that termination of her parental rights is in the Child's best interests.

**A. Whether DCS Presented Sufficient Evidence to Prove the Second Element That Is Required to Be Proven Before a Court May Order the Involuntary Termination of One's Parental Rights**

On appeal, Mother argues that DCS failed to establish by clear and convincing evidence that (1) there is a reasonable probability that the conditions resulting in the Child's removal from and continued placement outside her care will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child poses a threat to the well-being of the Child.

It is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find *either* that (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to the child, *or* (3) the Children have been adjudicated CHINS on two separate occasions. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where, as here, the juvenile court concludes that DCS has sufficiently proved one of the above-stated factors and there is sufficient evidence in the record supporting the juvenile court's conclusion, it is not necessary for DCS to prove, or for the juvenile court to find, either of the other two factors listed in Indiana Code section 31-34-2-4(b)(2)(B). *See generally In re S.P.H.*, 806 N.E.2d at

882 (providing that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only prove and the juvenile court need only find that one of the factors listed in that sub-section is true).

In order to determine whether the conditions will be remedied, the juvenile court should first determine what conditions led DCS to place the Child outside of Mother's care or to continue the Child's placement outside of Mother's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need

8

establish only that there is a reasonable probability that the parent's behavior will not change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, the juvenile court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for the Child's removal from and continued placement outside of Mother's care would be remedied, and upon review, we conclude that the juvenile court's determination to this effect is supported by the record. In support of its determination, with respect to Mother, the juvenile court found as follows:

> 4. On or about March 21, 2011, Child and [Mother] … became involved with the DCS when the DCS investigated a report that the home was in disarray and that marijuana roaches and drug paraphernalia were found in the home[.]
>
> ****
>
> 10. On or about August 31, 2011, a fact-finding hearing was held in the underling CHINS proceedings, at which [Mother] appeared in person and with appointed counsel…. Mother … admitted to the allegations and the CHINS court found the following facts, which are now adopted as facts found for the purposes of this termination proceeding:
>> a. On or about March 21, 2011, in Hancock County, Indiana the Child was residing with [Mother] and the Child's sibling in a home that was unsafe and hazardous to the [Child] with dirty clothes piled everywhere, the kitchen sink was backed up and not operational, and spoiled food strewn about. There was a strong odor of urine.
>> b. There were shotgun shells found both inside and outside of the home, all within reach of the Child if [he] had been present. Law enforcement found a shotgun that appeared to have been recently fired.
>> c. Mother has a history of drug abuse including pills, heroin, and cocaine.
>> d. On April 27, 2011, a domestic violence incident took place between Mother and [Father]. [Father] was arrested and later pled guilty to domestic battery.

9

e. In early May, after this case was initiated, Mother left the state and failed to contact DCS or her attorney and attempts made by DCS to contact Mother were unsuccessful for about three weeks.

11. On or about August 31, 2011, the CHINS court issued dispositional and parental participation orders following a hearing on the matter. The following are found as facts from the disposition and parental participation orders issued by the CHINS court, for purposes of this termination proceeding:

a. The Child was to remain in his current foster care placement and the Court found this placement to be the lease restrictive, most family like and most appropriate setting available;

b. The Child was to receive visitation with Mother …;

c. [Mother] …, as part of the specific disposition and parental participation orders, [was] ordered to do the following: maintain contact with DCS weekly; notify DCS of any new arrests or criminal charges; allow DCS and service providers to conduct announced or unannounced home visits and Child welfare checks; keep all appointments with DCS, CASA, and service providers; provide written releases of information; ensure that the Child is not removed from the County for a period of more than seventy-two (72) hours without the specific consent of the [FCM]; obtain and maintain stable housing and source of support or income sufficient for the safe and appropriate upbringing of the Child; assist in the formulation and put in place a protection plan which protects the Child from abuse/neglect; see that the child is properly clothed, fed, and supervised, neither possess [n]or use drugs or alcohol or abuse prescription levels on prescribed substances; censure that the child becomes engaged in home-based counseling; complete a parenting assessment and successfully complete all recommendations developed as a result of the assessment; complete a substance abuse assessment and follow all treatments and succesful[ly] complete all treatment recommendations developed as a result of the substance abuse assessment; submit to random drug/alcohol screens within one hour of request; follow all terms of probation currently ordered in any criminal matters; meet all personal medication and mental health needs for themselves and the Child; not commit any acts of domestic violence on anyone including the Child and agree that if an instance of domestic violence occurs to contact the DCS; actively participate in, cooperate with, and successful[ly] complete all recommendations as a result of any domestic

10

violence assessments/programs; attend any scheduled visits with the Child and comply with all visitation rules and procedures set forth by the DCS or service provider; and provide the Child with a safe, secure, and nurturing environment free from abuse and neglect and be an effective caregiver.

****

13. On or about March 14, 2012[,] a review hearing was held in the underlying CHINS case. The following facts from the CHINS court order are found as facts for purposes of this termination proceeding:

****

c. Mother … [has] not enhanced [her] ability to fulfill [her] parental obligations.

d. [Mother] has visited with the Child.

e. Mother … [has] not cooperated with DCS.

f. Additional services are required for … Mother, including home-based homemaker or home-based casework services to assist [her] with housing, employment, transportation, childcare, and other needs.

****

k. DCS has made reasonable efforts to reunify or preserve the Child's family.

l. DCS has made the following efforts to offer and provide family services, including the outcome arising from offering and provided family services: Mother missed multiple counseling sessions at Gallahue MHC which led to the therapist's recommendation that she no longer attend so that she could concentrate on home-based therapy. Mother also failed to meet with her home-based therapist for the entire month of January, cancelling appointments due to sickness, work, and other reasons. The Child was placed with Mother on a trial home visit; however, Mother asked Father to enroll the Child in a school near his home because she was having difficulty getting the Child to school.… Mother did not complete an alcohol/substance abuse outpatient program with Gallahue Mental Health Center.…

****

14. On or about May 15, 2012, the DCS filed an Emergency Motion for Removal and Return of Child, stating that the Mother and Father were currently in North Carolina with the Child in noncompliance of the Dispositional Order.

15. On or about May 15, 2012, the CHINS court granted an Order on DCS' Emergency Motion for Removal and Return of Child, ordering the Child to be removed from the parents and returned to Indiana.

16. On or about August 15, 2012, another review hearing was held in the underlying CHINS case. The following facts from the CHINS court order are found as facts for purposes of this termination proceeding:

\*\*\*\*

c. [Mother has] not complied with the Child's case plan. [Mother has] moved to North Carolina and [has] not maintained services or contact with DCS.

\*\*\*\*

e. [Mother has] not enhanced [her] ability to fulfill [her] parental obligations.

f. [Mother has] not visited with the Child since May 16, 2012.

g. [Mother has] not cooperated with DCS.

\*\*\*\*

i. Additional services are required for the Child or Child's parents; mental health evaluation and recommended treatment.

\*\*\*\*

p. DCS has made reasonable efforts to reunify or preserve the Child's family.

q. DCS has made the following efforts to offer and provide family services, including the outcome arising from offering and providing family services: referral for substance abuse treatment to establish and maintain sobriety for [M]other, referral for home-based therapy for parents, … random drug-screens for [Mother] to monitor sobriety, trial home visit to maintain parent-child relationship.

\*\*\*\*

17. As of the review hearing conducted on or about August 15, 2012, [Mother] continued [her] non-compliance with the DCS. The Child remained out of the home and in foster care.

\*\*\*\*

20. On or about August 28, 2013, another review hearing was held in the underlying CHINS case. The following facts from the CHINS court order are found as facts for purposes of this termination proceeding:

\*\*\*\*

c. [Mother has] not complied with the Child's case plan.

\*\*\*\*

e. [Mother has] not enhanced [her] ability to fulfill [her] parental obligations.

f. [Mother has] visited with the Child.

g. [Mother has] not cooperated with DCS.

****

i. Additional services are required for the Child or Child's parents: ongoing foster care placement of the [C]hild, continued services towards reunification for Mother.

****

m. The cause of the Child's out of home placement or supervision has not been alleviated.

****

p. DCS has made reasonable efforts to reunify or preserve the Child's family.

q. DCS has made the following efforts to offer and provide family services, including the outcome arising from offering and providing family services: home-based therapy, home visits, and random drug screens for Mother…. [Mother has not] complied with services.

****

21. On or about January 30, 2014, another review hearing was held in the underlying CHINS case. The following facts from the CHINS court order are found as facts for purposes of this termination proceeding:

****

c. [Mother] has/has not complied with the Child's case plan as follows: Mother is participating in supervised visits with the Child. Mother has voluntarily submitted to drug screens when asked; however, Mother has tested positive on these drug screens for marijuana. Mother has been unable to establish stable housing or employment.

****

f. Mother has not enhanced her ability to fulfill her parental obligations as she continues to test positive for illegal substances and has been unable to establish any financial and housing stability.

****

h. Mother is participating in supervised visits with the Child.

****

l. The cause of the Child's out of home placement or supervision has not been alleviated.

****

o. DCS has made reasonable efforts to reunify or preserve the Child's family.

p. DCS has made the following efforts to offer and provide family services, including the outcome arising from offering and

13

providing family services: Mother has been referred for home-based therapy and supervised visitation. The [C]hild has been referred for home-based therapy.

****

22. At the trial conducted on the termination petition on 3/19/2014, DCS [FCM] Harter testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. [Harter] was the DCS Family Case Manager that oversaw the underlying CHINS case from its inception in March of 2011 until July [of] 2011 when the case was reassigned to another case manager;

b. On or about March 25, 2011, Mother left the state of Indiana to go to North Carolina;

c. Mother had little contact [with] the [C]hild between removal on 3/21/2011 and leaving to go to North Carolina;

d. Mother was in North Carolina for roughly two weeks;

e. While in North Carolina[,] Mother and Father were married;

f. During the time [Harter] was assigned to the case[,] Mother missed several visits with the Child[.]

****

24. At the trial conducted on the termination petition on 3/19/2014, Carissa Cullumber testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. [Cullumber] is employed as a home-based therapist for Family Works and was assigned as the therapist for the Mother from August [of] 2011 until May [of] 2012;

b. [Cullumber] stopped working with the Mother in May of 2012 after Mother left Indiana and went to North Carolina;

c. Mother missed roughly 8-10 appointments with [Cullumber] during the time [Cullumber] was assigned as her therapist;

d. Mother did not have stable housing from January through May of 2012;

****

f. Due to the missed appointments and Mother leaving the state, Mother's treatment goals for therapy were not met[.]

25. At the trial conducted on the termination petition on 3/19/2014, Laura Bentley testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. [Bentley] is employed as [a] home-based therapist with Lifeline assigned as the Child's therapist;

b. [Bentley] has been working as the Child's therapist from June [of] 2013 to [the] present;

c. [Bentley] has been supervising therapeutic visitation between the Mother and Child since August [of] 2013;

****

e. The Child appears to feel guarded and uncomfortable during his visits with Mother;

f. Mother has cancelled some visits with the Child;

g. Mother has not had stable housing since November [of] 2013;

****

i. Mother's bond with the Child appears to be more of a buddy or friendship bond than a parent-child bond[.]

26. At the trial conducted on the termination petition on 3/19/2014, Family Case Manager Supervisor John Mullany testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. [Mullany] was the DCS [FCM] that oversaw the underlying CHINS case from November [of] 2011 until October [of] 2012 when the case was reassigned to another case manager due to [Mullany] being promoted;

b. From October [of] 2012 to present[,] [Mullany] has … continued to have involvement in the case;

c. The DCS has provided and referred multiple services to the Mother throughout the DCS case including home-based therapy, substance abuse treatment, case management, drug screens, medication evaluations, and supervised visitation;

****

e. The Child was placed on a Trial Home Visit with the parents from November [of] 2011 until May [of] 2012;

f. In January [of] 2012, Father left the family residence and went to North Carolina. Mother was no longer able to afford housing after Father left and had unstable housing for her and the Child from January [of] 2012 until May [of] 2012;

g. In May [of] 2012, Mother took the Child to North Carolina without DCS or Court approval necessitating an emergency court order to return the Child to Indiana and ending the Trial Home Visit;

15

h. Mother [has] not complied with the Dispositional and Parental Participation Order entered in the underlying CHINS case;

i. Since the Child's return from North Carolina in May [of] 2012[,] the Child has not been placed back with [Mother] due to noncompliance with the Dispositional Order and instability;

j. During the period [Mullany] was assigned as the Family Case Manager, Mother did not have stable employment;

k. While Mother has tested negative on drug screens in the past, Mother has also tested positive for controlled substances on multiple occasions;

l. During the period [Mullany] was assigned as the Family Case Manager, several referrals for services had to be closed out due to the noncompliance of one or both of the parents[.]

27. At the trial conducted on the termination petition on 3/19/2014, Renata Winter testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. [Winter] is employed as [a] home-based therapist with Lifeline;

b. [Winter] was assigned to work [as] the Mother's therapist in November [of] 2013;

c. [Winter] closed the referral as the Mother's therapist in January [of] 2014, due to Mother's noncompliance;

d. During the period [Winter] was assigned as Mother's therapist, Mother cancelled 4-5 appointments[.]

28. At the trial conducted on the termination petition on 3/19/2014, Family Case Manager Supervisor Ashley Cave testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. [Cave] was the DCS [FCM] that oversaw the underlying CHINS case from October [of] 2012 until December [of] 2012[,] when the case was reassigned to another case manager;

b. During the time [Cave] was assigned to the case, Mother was receiving the following services: home-based therapy, case management, and supervised visitation;

****

e. Mother also tested positive for controlled substances while [Cave] was assigned to the case;

f. Mother did not have stable housing throughout the time [Cave] was assigned to the case …;

16

g. While [Cave] was assigned as the FCM on the underlying CHINS case[,] Mother did not have stable employment;

h. While [Cave] was assigned as the FCM on the underlying CHINS case[,] neither parent demonstrated an availability and ability to effectively parent the Child[.]

29. At the trial conducted on the termination petition on 4/10/2014, [FCM] Katie Huntsman testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. [Huntsman] is the current DCS [FCM] overseeing the underlying CHINS case and has been assigned [to] the case from December [of] 2012 to present;

****

c. Throughout the underlying CHINS case, Mother has not been able to maintain stable housing or employment on her own;

****

f. When Mother began testing positive for controlled substances in June [of] 2013[,] [Huntsman] asked her if she wanted to do substance abuse treatment to which the Mother stated that she did not want or need it;

g. [Huntsman] initiated other conversations with the Mother regarding substance abuse treatment and Mother stated that she did not want or need a referral for substance abuse treatment completed as she had already completed treatment once and didn't need to go again;

h. Neither Mother nor her attorney ever petitioned the Court in the underlying CHINS case asking for services for substance abuse treatment;

i. On March 19, 2014, the same day as the first day of the fact-finding hearing in this case, [Huntsman] administered a drug screen to Mother which came back positive for Hydrocodone and Methadone;

j. Prior to the administration of the screen on March 19, 2014, Mother told FCM Huntsman that she was going to test positive for marijuana and a sedative someone had given her;

k. [Huntsman] testified that she does not believe Mother could maintain a safe or stable environment for [the Child] at this time as the home where Mother is currently living is not suitable due to a past history of domestic violence being reported by the Child living in the home;

l. While [Huntsman] was assigned to the case[,] Child and Family Team Meetings were held every month or so at the

17

Mother's request until July [of] 2013[,] when Mother stated that she didn't feel the need to have any further meetings;

m. At the Child and Family meetings Mother was notified on several occasions of the DCS' case plan and [Huntsman] discussed the possibility of termination of parental rights with Mother;

n. Mother has ben informed multiple times since January [of] 2013 of the possibility of adoption/termination;

o. [Mother did not attend] the Case Plan Conference held in December [of] 2013[.]

**\*\*\*\***

30. At the trial conducted on the termination petition on 4/10/2014, [Mother] testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. DCS became involved in the underlying CHINS case due to the conditions of the home at the time of removal and [Mother's] underlying drug use;

b. Mother testified that she does not have stable housing or employment;

**\*\*\*\***

d. Mother testified to refusing substance abuse treatment when it was offered to her by the DCS once she began testing positive for controlled substances in the summer of 2013;

e. Mother testified that substance abuse treatments were not helpful as it took too much gas, time, and money[.]

**\*\*\*\***

33. At the trial conducted on the termination petition on 4/10/2014, Beverly Bergmann testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. [Bergmann] has served as the [Court Appointed Special Advocate ("CASA")] on the underlying CHINS case from June [of] 2011 to present;

b. During the time of the trial home visit, Mother left the Child in the care of caregivers who were not approved by DCS or the Court;

c. During the time the Child was on a trial home visit, Father left the state and the Mother and Child moved frequently;

d. During the time of the failed trial home visit, the Mother and Child lived at approximately 13 different residences in a six month period;

18

e. Once the Child was returned from North Carolina in May [of] 2012, Mother did not return to Indiana until August [of] 2012[;]

f. Throughout the history of the CHINS case, there have been several periods where one or both parents were unable to be located;

**\*\*\*\***

h. Throughout the CHINS case, Mother has not been able to maintain stable housing or employment[.]

**\*\*\*\***

34. At the trial conducted on the termination petition on 4/10/2014, Jim Polly testified. The following are found as facts and reasonable inferences from this testimony, and adopted as found facts for purposes of this termination proceeding:

a. [Polly] is employed as a mental health therapist with Gallahue and was assigned as Mother's home-based case worker from October [of] 2012 to November [of] 2013;

b. After Mother began testing positive for controlled substances in the summer of 2013, [Polly] asked the Mother about entered into substance abuse treatment;

c. Mother declined substance abuse treatment through Gallahue;

d. [Polly] did have the authority to refer for substance abuse treatment but did not do so due to Mother declining the service[.]

35. Multiple service provider referrals were canceled or closed out by service providers due to [Mother] failing to maintain contact with the service providers or DCS, and/or failing to comply with participation expectations put in place[.]

36. Mother tested positive for controlled substances on drug screens collected on the following dates:

a. March 21, 2011: positive for THC (4.2 ng/mL) and cocaine (13.9 ng/mL);

b. March 22, 2011: positive for THC (1.2 ng/mL) and cocaine (4.4 ng/mL);

c. March 23, 2011: positive for THC (2.1 ng/mL) and cocaine (2.3 ng/mL);

d. December 4, 2012: positive for THC (1.9 ng/mL);

e. June 19, 2013: positive for THC (10.3 ng/mL);

f. July 18, 2013: positive for THC (23.4 ng/mL);

g. July 24, 2013: positive for THC (1 ng/mL), and cocaine (32.2 ng/mL);

h. August 8, 2013: positive for Hydrocodone (26.8 ng/mL);

i. August 27, 2013: positive for THC (11.4 ng/mL) and Oxycodone (54.6 ng/mL);
j. October 1, 2013: positive for THC (21.5 ng/mL);
k. October 29, 2013: positive for THC (3 ng/mL);
l. November 5, 2013: positive for THC (0.8 ng/mL);
m. November 6, 2013: positive for THC (1.4 ng/mL);
n. December 2, 2013: positive for THC (2.3 ng/mL);
o. January 29, 2014: positive for THC (1.4 ng/mL);
p. March 19, 2014: positive for Hydrocodone (58.4 ng/mL) and Methadone (22.2 ng/mL)[.]

****

41. Each of the above paragraphs is expressly adopted as the Court's own finding of fact. Each paragraph, independently and cumulatively, demonstrates this Court's finding that there is a reasonable probability that the conditions that resulted in the Child's removal or the reasons for placement outside the home of the parents will not be remedied[.]

Appellant's App. pp. 130-146. In light of these findings, the juvenile court concluded that DCS established by clearing and convincing evidence that the reasons for the Child's removal from and continued placement outside Mother's home would not be remedied.

Mother does not challenge the sufficiency of the evidence supporting the juvenile court's above-stated findings on appeal. Rather, Mother argues that the trial court should have credited certain evidence which she claims demonstrates progress by Mother, which Mother claims indicates that the conditions leading to the Child's continued placement can be remedied. However, although Mother claims that the evidence demonstrates that Mother has made progress, it was within the province of the juvenile court, as the finder of fact, to minimize any contrary evidence of changed conditions in light of its determination that the reasons for the Child's removal from and continued placement outside Mother's home would not be remedied.

Further, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the testimony as Mother. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. Mother's claim effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879. When considered as a whole, we conclude that the juvenile court did not err in concluding that the reasons for the Child's removal from and continued placement outside Mother's home would not be remedied.

## B. Whether DCS Presented Sufficient Evidence to Prove the Third Element That Is Required to Be Proven Before a Court May Order the Involuntary Termination of One's Parental Rights

Next, we address Mother's claim that DCS failed to prove by clear and convincing evidence that termination of her parental rights was in the Child's best interests. We are mindful that in determining what is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id.* Furthermore, this court has previously determined that the testimony of the case worker or Guardian Ad Litem ("GAL") regarding the child's need for permanency supports a finding that termination is in the child's best interests. *Id.*; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

21

Here, the testimony establishes that the Child has a need for permanency and stability and that the termination of Mother's parental rights would serve his best interests. FCM Huntsman, the Child's GAL, Bonnie Wooton, and CASA Bergmann testified that they believed that the termination of Mother's parental rights was in the Child's best interests. Each also testified to the Child's need for permanency.

GAL Wooten testified that she recommended termination of Mother's parental rights. In support of this recommendation, GAL Wooten testified as follows:

> I do that very sadly but um I felt like this child has been in foster care for at least half of his life, that the parents have for one reason or another and we can put blame to whomever we want. You know I – I guess that's a matter of which version of everything that you go with, but still the parents struggle and the father has kind of excused himself out of the – out of the picture, Mother continues to struggle. The new drug use causes me some very big concern. The – I guess mannerisms on the visit that I observed part of the visit with the child … [b]ut I think all together with the – the span of this case if we look at it in the totality of the situation … and I think that you know this child has been in foster care long enough that we need to – to do something for him to feel like he has a permanent family.

Tr. pp. 384-85. In addition, FCM Huntsman indicated that termination of Mother's parental rights would be in the Child's best interest because Mother's continued instability and drug use was a threat to his well-being as he needed "a permanent place to live." Tr. p. 287. CASA Bergmann also testified regarding the Child's need for permanency, stating that the Child "was only three and a half when he went into foster care and he's been there a very long time and its just time for him to have a permanent home, a permanent forever family." Tr. pp. 421-22.

The evidence demonstrates that throughout DCS's involvement with the Child,

22

Mother has failed to refrain from illegal drug use and has failed to obtain or maintain stable housing and employment. While Mother had, at times, appeared to have made progress, at the time of the termination hearing, none of the appropriate case workers or service providers could recommend that the Child be returned to Mother's care. The juvenile court did not have to wait until the Child was irreversibly harmed such that his physical, mental, and social development was permanently impaired before terminating Mother's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. In light of the testimony of FCM Huntsman, CASA Bergmann, and GAL Wooten, considered with Mother's failure to successfully complete services, failure to refrain from illegal drug use, and continued lack of stability, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Mother's parental rights is in the Child's best interests. Again, Mother's claim to the contrary merely amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

## II. Additional Challenge Raised by Mother

We next address Mother's claim that the juvenile court erred in adopting DCS's proposed findings and conclusions thereon and in framing its findings as an alleged recitation of witness testimony.

### A. Adoption of Proposed Findings of Fact and Conclusions Thereon

In *A.F. v. Marion County Office of Family and Children*, 762 N.E.2d 1244, 1249 (Ind. Ct. App. 2002), we concluded that a trial court's verbatim adoption of a parties proposed findings of fact and conclusions thereon "was not, in and of itself, improper." Specifically,

23

we concluded as follows:

> When the trial judge signs the findings of fact and conclusions of law, they become the court's findings of fact and conclusions of law. The court is responsible for their correctness. These findings of fact and conclusions of law are not weakened because they are adopted verbatim. If the proposed findings of fact and conclusions of law did not state the facts as the trial court found them to be, it would not have adopted them as its own. [Trial Rule 52(C)] encourages the trial court to request the parties to submit proposed findings of fact and conclusions of law. These findings will not be set aside unless clearly erroneous. [Internal citations omitted].

*Tri-City Plaza Bowl v. Estate of Glueck*, 422 N.E.2d 670, 674 (Ind. Ct. App. 1981) (as cited by *Nat'l Briquette Corp. v. State Bd. of Tax Com'rs*, 604 N.E.2d 11, 13 (Ind. Ct. App. 1992), *trans. denied*). More recently our supreme court addressed the trial court's wholesale adoption of findings of fact and conclusions of law stating that:

> > "It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. The trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning. We recognize that the need to keep the docket moving is properly a high priority for our trial bench. For this reason, we do not prohibit the practice of adopting a party's proposed findings."

[*Wrinkles v. State*, 749 N.E.2d 1179, 1188 (Ind. 2001)] (quoting *Prowell v. State*, 741 N.E.2d 704, 708-09 (Ind. 2001)).

*A.F.*, 762 N.E.2d at 1249 (footnote omitted, internal quotation marks added).

In the instant matter, Mother does not challenge the accuracy of the findings that were proposed by DCS and adopted by the juvenile court. Our review of the instant matter indicates that the findings are indeed accurate. Therefore, we conclude that the juvenile court did not err by adopting DCS's proposed findings of fact and conclusions thereon.

**B.  Organizing the Findings in a Manner to Reflect Witness Testimony**

24

Indiana Code section 31-35-2-8(c) provides that the juvenile court shall enter findings of fact that support the required conclusions regarding the termination of one's parental rights. Findings of fact must be specific enough to provide the reader with an understanding of the juvenile court's reasons, based on the evidence, for its findings of ultimate fact. *Moore v. Ind. Family & Soc. Servs. Admin.*, 682 N.E.2d 545, 547 (Ind. Ct. App. 1997). Findings which indicate that the testimony or evidence "was this or the other are not findings of fact." *Id*. Rather, "[a] finding of fact must indicate, not what someone said is true, but what is determined to be true, for that is the trier of fact's duty." *Id*.

Here, contrary to Mother's claim, the majority of the juvenile court's findings did not merely restate the witnesses' testimony.[2] In making factual findings that related to each witness's testimony, the juvenile court's order stated the following:

> At the trial conducted on the termination petition on [date], [witness] testified. The following are found as facts and reasonable inferences from this testimony, and adopted as facts for purposes of this termination hearing.

Appellant's App. pp. 137-44. In addition, the juvenile court specifically found as follows:

> Each of the above paragraphs is expressly adopted as the Court's own finding of fact. Each paragraph, independently and cumulatively, demonstrates this Court's finding that there is a reasonable probability that the conditions that resulted in the Child's removal or the reasons for placement outside the home of the parents will not be remedied[.]

Appellant's App. p. 140. While the juvenile court's order is organized in a manner that sets out the juvenile court's findings as they relate to each witness's testimony, the above-stated language indicates that the juvenile court's findings were not merely a recitation of the

---

[2] The exception to this statement is the juvenile court's findings regarding Mother's testimony. One can reasonably infer, however, that the juvenile court merely adopted Mother's testimony as party admissions.

particular witness's testimony, but rather were the factual findings made by the juvenile court as the findings related to the witness's testimony. Further, as is stated above, Mother does not challenge the accuracy of any of the juvenile court's findings, and upon review we conclude that said findings are accurate. As such, we cannot say that the juvenile court erred in organizing its findings of fact in the manner that it did so.

## CONCLUSION

Having concluded that the evidence is sufficient to support the juvenile court's order terminating Mother's parental rights to the Child, we affirm the judgment of the juvenile court.

The judgment of the juvenile court is affirmed.

NAJAM, J., MATHIAS, J., concur.